**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH J. GOOD,** | : | **Civil No. 4:24-CV-1158** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **FRANK BISIGNANO,**[1] | | |
| **Commissioner of Social Security** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

## I.  Introduction

The plaintiff in this case, Joseph Good, suffers from an array of physical and mental impairments which, undisputedly, restrict his work-related abilities but which the administrative law judge (ALJ) in the case found were not entirely disabling. Good now challenges the decision of the ALJ denying him disability benefits, arguing that the ALJ committed multiple errors in evaluating the medical

---

[1] Frank Bisignano became the Commissioner of Social Security on May 6, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

opinion evidence and incorporating these limitations into his residual functional capacity (RFC) in compliance with the Social Security Regulations.

Our analysis of this case is cabined and confined by the standard of review in Social Security cases, which is limited by the Supreme Court's mandate that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). Under this standard of review, we are obliged to affirm the decision of the administrative law judge (ALJ) once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" Monsour Med. Ctr. v. Heckler,

806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804

F.2d 808, 812 (3d Cir. 1986)).

Here, after a review of the record, mindful of the fact that substantial evidence

"means only—'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that

substantial evidence supported the ALJ's findings in this case. Therefore, for the

reasons set forth below, we will affirm the decision of the Commissioner denying

this claim.

## II.    Statement of Facts and of the Case

### A. Background

The administrative record of Good's disability application reveals the

following essential facts: On February 24, 2021, Good applied for benefits under

Titles II and XVI of the Social Security Act, alleging an onset of disability beginning

November 19, 2019, but later amending his onset date to February 2, 2021.[2] (Tr. 10,

95). According to Good, he was completely disabled due to the combined effects of

back conditions, arthritis, and neck conditions. (Tr. 71). Good was born on

December 7, 1969, and was forty-nine years old on his amended alleged disability

---

[2] This was Good's second disability application. The amended onset date reflects the day after his previous application for disability benefits was denied. (Tr. 10).

onset date, which is defined as a person closely approaching advanced age under the Commissioner's regulations. (Tr. 27, 95). He has a high school education and previously worked as a molding machine operator, pipeline laborer, water treatment plant operator, tire repairer, loader, and sawmill operator. (Tr. 26, 27).

The evidence throughout the relevant period demonstrates that Good suffered from chronic pain due to degenerative disc disease and lumbar radiculopathy, as well as chronic obstructive pulmonary disease (COPD) and obesity. Moreover, the record demonstrates that he had impaired intellectual functioning; although he graduated high school, he testified that he was in special education classes and his prior disability application showed a full scale IQ of 70. (Tr. 19, 116, 648). He was also diagnosed with an adjustment disorder and testified that he gets "mean and nasty" from his pain. (Tr. 19, 649).

With regard to his physical impairments, the ALJ summarized the longitudinal medical evidence as follows:

> The claimant alleged pain in his low back radiating down his both legs and neuropathy in his lower extremities (Hearing Testimony). Prior to the amended alleged onset date, x-rays of the lumbar spine from December 2019 showed no acute bony injury of the lumbar spine; mild degenerative disc disease at L1-L2 and L3-L4; and no spondylolisthesis (Exhibit B1F/2). Follow up magnetic resonance imaging (MRI) of the lumbar spine from December 2019 showed a leftsided disc herniation at L4-5 effacing the left lateral recess that might have been impinging upon the left L5 nerve roots (Exhibit B1F/1). The longitudinal evidence

4

documents medication prescribed, Gabapentin, by his primary care provider since 2019 for left sided sciatica (Exhibit B2F/12). The longitudinal evidence reflects his reports that he had tried physical therapy sometime in 2019 that worsened his symptoms (Exhibit B2F/14). The longitudinal evidence reflects conservative chiropractic care from November 2019 through September 2020 for his pain complaints (Exhibit B3F/25-56). In addition, the longitudinal evidence documents that the claimant underwent pain injection therapy in July 2019 and August 2020, which the pain management records documented were effective at treating his symptoms and improving his functioning (Exhibit B3F/14, 17, 21-22, 23-24). Conversely, the claimant testified that the injections did not help (Hearing Testimony).

However, the primary care provider from January 2020 through December 2020 documented that his sciatica was improved, stable, and under good control on his prescribed medication and he was able to do more activities (Exhibit B2F/16, 18, 20, 22, 23).

Since the amended alleged onset date, the evidence documented that the claimant returned to his chiropractor the end of January 2021 complaining of worsening low back pain with spasms and pain shooting down his legs exacerbated by the cold weather (Exhibit B3F/59). On exam, tenderness and tightness were noted in his low back and left lumbar paraspinal region; his gait was not antalgic (Exhibit B3F/59). He was treated with conservative chiropractic care through March 2021 (Exhibit B3F/60-66).

In April 2021, the primary care provider records reflected a routine six month follow up visit were the claimant complained that his back pain was acting up every other day. His doctor noted that on exam lumbar spasms were noted but otherwise, the claimant's range of motion was completely normal and not associated with any pain or aggravation of the left leg; he could bend at the waist with no problem; his reflexes were symmetric; and there was no motor weakness in the lower legs (Exhibit B2F/25). Notably, the office visit notes documented that the claimant remained active around the house and his main function was taking care of, observing, and being a 24-hour companion to his

mother-in-law, who had a stroke, seizures, and was aphasic (Exhibit B2F/25). His sciatica was assessed as stable, and his gabapentin was refilled without any adjustment to the dosage (Exhibit B2F/26).

Additionally, the claimant returned to pain management in April 2021 (Exhibit B3F/17-20). The exam showed mildly decreased sensation in the left lower extremity L4-L5, decreased left lower extremity strength 4+/5, lumbar facet tenderness, positive straight leg raise testing on the left, and mildly positive SI joint testing maneuvers on the left. Otherwise, the remaining findings were reported normal (Exhibit B3F/19). Repeat SI joint injections were recommended; however, there is no indication that the claimant returned for the procedure (Exhibit B3F/20).

That being said, the ongoing evidence is quite limited and no more than conservative in nature. The claimant did return to his chiropractor in April 2021; however, he reported that his low back pain and reported numbness in his bilateral lower extremities were aggravated by his increased amount of physical activity, lifting and bending, due to preparing his trailer for camping (Exhibit B3F/68). The records documented that he reported only two spasms in his low back while he was away camping (Exhibit B3F/69). He was seen three times in May 2021 and reported an exacerbation in symptoms after moving a hot water heater (Exhibit B3F/69-70, 71).

The evidence reflects a six-month gap in any treatment until he returned to his chiropractor the end of October 2021 for treatment reporting an exacerbation in symptoms while moving his camper over the past few days (Exhibit B6F/1). The exam showed tenderness and tightness were noted in his low back and left lumbar paraspinal region and mildly decreased cervical range of motion (Exhibit 6F/1). However, the claimant cancelled every one of his scheduled appointments in November 2021 (Exhibit B6F/3).

On November 1, 2021, the claimant presented for a consultative physical examination. Here, he reported multiple physical conditions, including back pain, arthritis, and a herniated disc ongoing since 2016,

6

as well as left leg numbness at times and chronic obstructive pulmonary disease (COPD) since 2021. He stated that he used a walking stick at times but did not bring it to the exam. The objective findings documented a recorded weight of 256 pounds; his gait was normal, and he could walk on heels and toes without difficulty; he needed no assistance with transferring from sitting to standing; he could squat 70% of full; his lungs were clear to auscultation bilaterally. Other than straight leg raise testing positive on the right, low back pain with range of motion testing, and sensation absent in all ten toes; the remaining findings were reported normal.

(Tr. 19-20).

Thus, while the record reflects a history of chronic back pain and neuropathy in his lower legs, his treatment was limited and overall conservative, with significant gaps in his treatment, the cancellation of appointments and relatively unremarkable examination findings. The ALJ went on to summarize the similarly unremarkable and sparce treatment records throughout the remaining disability period:

The evidence does not reflect any treatment during 2022 except for some chiropractic care from July 2022 through October 2022 (Exhibit B14F). In September 2022, the records document his complaints of bilateral lower extremities weakness and that he was falling often; however, the totality of the evidence reflects no evaluation or treatment for his symptoms (Exhibit B14F/6). The chiropractic exam noted tautness and tenderness in the lumbar spine bilaterally and tenderness in the SI joint on the right; however, the exam does not indicate any gait dysfunction or imbalance/instability (Exhibit B14F/6). In October 2022, the claimant reported an exacerbation in his pain from splitting wood but with treatment he reported improvement in his lumbar region (Exhibit B14F/14, 16). The claimant cancelled all his scheduled appointments in November 2022 and thereafter in January 2023 (Exhibit B14F/17).

7

The evidence reflects that the claimant presented in November 2022 for a repeat lumbar spine MRI that was ordered due to increasing pain in his low back radiating down his legs. The imaging showed at L4-L5, there was a small left foraminal disc protrusion and spondylosis resulting in mild left neuroforaminal narrowing and at L5-S1 there was a new right posterolateral disc herniation and spondylosis resulting in mild right lateral recess stenosis (Exhibit B12F/3-4). However, the records does not indicate that the claimant was evaluated by any treating provider for follow up of this report.

Notably, the evidence lacks no further primary care provider treatment since April 2021, except for medication refills in February 2022, January 2023, and April 2023 until he was seen by a new primary care provider on July 6, 2023 (Exhibit B13F/33-39). On July 6, 2023, the claimant reported low back pain for the past few days, although he had not taken a pain pill and was not in any pain at present; and anger control issues, which he stated was his most important issue (Exhibit B13F/9, 10). The office note documented that he was prescribed and taking bupropion, which was ordered for him on February 20, 2023, and he controlled his anger by removing himself from situations; however, there is no actual office visit or exam for that date (Exhibit B13F/8, 10). Other than his weight of 243 pounds and BMI 32.09, the physical exam was reported generally within normal limits; his appearance was normal; he was fully alert and oriented; his pulmonary effort was normal; and he was neurologically intact. He was diagnosed with mood changes and referred to counseling. Notably, there is no diagnosis associated with his back pain (Exhibit B13F/12). Furthermore, the evidence lacks any indication that he followed through with the recommendation for counseling, as the evidence lacks any formal mental health treatment.

(Tr. 21-22).

The ALJ also considered the medical evidence of Good's COPD and obesity, noting:

Pertaining to his breathing issues, the longitudinal evidence reflects references that the claimant had a history of asthma/COPD and was a former smoker for many years (Exhibits B1F/11, B2F/1). He has been prescribed an inhaler for his reported wheezing; however, his lungs were clear on repeat physical exams (Exhibit B2F/1, 4, 6, 8). Chest x-rays from January 2019 were reported normal (Exhibit B1F/21). Computerized tomography (CT) scan/lung cancer screening was conducted in June 2023 and reported negative; imaging of the lungs showed no abnormality (Exhibit B12F/1). The evidence reflects that he quit smoking again in March 2023; however, normal pulmonary exams on repeat visits have been noted; and no more than a refill of his inhaler ordered (Exhibits B2F/23, B13F/6, 12, 31).

In terms of the claimant's obesity, the record clearly establishes obesity with the records showing weight of 243 to 260 pounds and BMIs 32.09 to 34.0 (Exhibits B2F/4, B4F, B13F/2, Hearing Testimony). However, the record does not establish specific limitations directly related to the claimant's obesity. Nevertheless, the undersigned has considered some level of limitation to stamina and mobility. In addition, as indicated above, the undersigned has taken into account the cumulative effects of the claimant's obesity when forming the residual functional capacity as set forth above.

(Tr. 22).

As far as the medical history of Good's mental impairments, the ALJ

considered a November 5, 2021, consultative examination:

On November 5, 2021, the claimant presented for a consultative mental status examination unaccompanied driving himself 35 miles to attend. Here, he reported completing high school and attending special education programming due to learning delays; he denied any history of inpatient psychiatric treatment but reported having some counseling at the age of 17; and endorsed irritability and high levels of frustration due to being unable to work due to constant pain and short-term memory problems. On exam, he reported his mood as feeling "lumpy,

here and there"; his attention and concentration were impaired due to cognitive delays indicated by him counting by 2s only to the number 8, he could add and subtract, but not multiply or divide, he could not complete serial 7s, but he completed serial 3s slowly with one mistake; his memory skills were mildly impaired; his intellectual functioning appeared to be in the impaired range and his general fund of information was somewhat limited; his language skills were poorly developed, his vocabulary limited, and he required occasional repetition of questions to ensure comprehension. Otherwise, he was cooperative; well groomed, his posture motor behavior, and eye contact were normal, his speech was fluent and clear; his thought processes were coherent, and goal directed, his affect was full range, and his insight and judgement were fair. As for his activities of daily living, here he reported needing help with showering and dressing, his wife managed their money due to the claimant's learning delays, he could not clean or do laundry, and he did not socialize or feel close to family; however, he could help with the shopping, was able to drive, enjoyed ceramics, and spent his days caring for his dogs, ducks, and chickens. He was diagnosed with an adjustment disorder (Exhibit B5F).

(Tr. 21). Beyond the findings of this examination, Good was diagnosed by his primary care physical with mood changes and was referred to counseling, but as the ALJ noted, there is no evidence he followed through with the recommendation for counseling since there is no evidence of any formal mental health treatment. (Tr. 22).

Given this clinical picture, a consultative examiner and three State agency medical consultants opined on Good's physical ability to perform work-related activities. The three State agency medical sources concurred that Good could perform a range of light work with some postural and environmental limitations. All

three opined that Good could stand and/or walk for a total of about six hours and sit for a total of about six hours in an eight-hour workday. (Tr. 99, 117, 705). The opinion of consultative examiner CRNP Shultz was more restrictive in terms of his ability to walk, stating he could only walk for up to three hours total in an eight-hour workday, but concurred with the State agency sources that he could stand and sit for six hours total in an eight-hour workday. (Tr. 632).

Similarly, a consultative examiner and three State agency experts opined on Good's mental RFC. Consultative examiner Dr. Cole opined that Good would have no limitations in understanding, remembering, and carrying out simple instructions and no limitations interacting with supervisors but would be mildly limited in his ability to interact with the public and coworkers, and would have moderate limitations in understanding, remembering, carrying out complex instructions and making judgments on complex work-related decisions. (Tr. 650).

State agency medical consultant Dr. Arlene Rattan opined that Good had moderate limitations in his ability to understand, remember, or apply information, concentrate, persist, or maintain pace, and adapt or manage himself, but had only mild limitations in his ability to interact with others. (Tr. 97). Dr. Rattan explained that Good could understand, retain, and follow simple instructions and perform simple, routine, repetitive tasks in a stable environment. (Tr. 110). She noted that he

11

was not significantly limited in his ability to carry out both very short and simple instructions and detailed instructions. (Id.) Finding him moderately limited in his ability to maintain attention and concentration for extended periods, Dr. Rattan explained that Good, "is able to meet the basic mental demands to complete 1-2 step tasks on a sustained basis despite the limitations resulting from their mental health impairment." (Tr. 111).

On reconsideration, Dr. Dawn Marie Long concurred in the limitations in the "paragraph B" criteria opined by Dr. Rattan but differed from Dr. Rattan in the more specific limitations of his ability to sustain concentration and pace, specifically opining that, although he was not significantly limited in carrying out very short and simple instructions, Good would be moderately limited in his ability to carry out detailed instructions. (Tr. 119). Nonetheless, Dr. Long confirmed that Good was able to understand, retain, and follow simple instructions, make simple decisions, and perform simple, routine, repetitive tasks in a stable environment. (Tr. 120).

Another State agency mental consultant, Dr. Ryan Mendoza, assessed Good's "paragraph B" criteria and found he would be only mildly limited in understanding, remembering, or applying information, interacting with others, and adapting or managing himself but concurred with the other consultants that Good was moderately limited in concentrating, persisting, and maintaining pace. (Tr. 696).

12

It was against this medical background that Good's case came to be considered by the ALJ.

### B. **The ALJ Decision**

A hearing was conducted in Good's case on August 8, 2023, at which Good and a vocational expert testified. (Tr. 41-73). Following this hearing, on October 31, 2023, the ALJ issued a decision in Good's case. (Tr. 7-33). In that decision, the ALJ first concluded that Good met the insured requirements of the Act through June 30, 2022, and had not engaged in substantial gainful activity since the amended alleged onset date of February 2, 2021. (Tr. 13). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Good had the following severe impairments: chronic obstructive pulmonary disease, obesity, degenerative disc disease of the lumbar spine, lumbar radiculopathy, and an adjustment disorder. (Tr. 13).

At Step 3, the ALJ determined that Good did not have an impairment or combination of impairments that met or medically equaled the severity of one of the disability listing impairments. (Tr. 13-17). In considering whether Good's mental impairment was severe, the ALJ considered whether the "paragraph B" criteria were satisfied. In making this assessment, the ALJ concluded based on the evidence that Good had a moderate limitation in his ability to remember or apply information, a

13

mild limitation in interacting with others, a moderate limitation in concentrating, persisting or maintaining pace, and a moderate limitation in adapting or managing himself. (Id.) These "paragraph B" findings aligned with the opinions of State agency consultants Drs. Rattan and Long.

Between Steps 3 and 4, the ALJ then fashioned a residual functional capacity ("RFC") for the plaintiff which considered all of Good's impairments as reflected in the medical record, and found that:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can occasionally operate pedals and foot controls; can occasionally balance, stoop, kneel, crouch, use ramps and climb stairs; can perform jobs that do not require crawling or climbing ladders, ropes or scaffolding; can tolerate occasional exposure to extreme cold, extreme heat, high humidity, vibrations, and atmospheric conditions that can potentially cause respiratory irritation, such as strong fumes, noxious odors, concentrated dust or gases, and work environments with poor ventilation; can perform jobs that do not require exposure to workplace hazards, such as unprotected heights and dangerous, moving machinery. He can perform jobs, that would take no more than 30 days of training to learn with a specific vocational preparation level of two (SVP2), which are generally classified as unskilled; can understand, remember and carry out simple instructions; can perform simple, routine and repetitive tasks; can perform jobs that would be considered "low stress" in that they would involve only occasional, simple decision making, and only occasional, gradual changes in the work duties and work setting.

(Tr. 17-18).

14

In fashioning this RFC, the ALJ considered the medical evidence, the expert opinions, and Good's self-described limitations. (Tr. 18-26). The ALJ first engaged in a two-step process to evaluate Good's alleged symptoms, finding that, although the plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 18-19).

In making this determination, the ALJ considered Good's statements and testimony regarding his impairments and limitations, noting:

> The claimant alleges a back condition, arthritis, and neck condition limit his ability to work (Exhibit B1E). In January 2022, he reports worsening back pain, neuropathy in his lower extremities, and recently being prescribed medication for depression (Exhibit B8E). In July 2022, he reported that his conditions worsened (Exhibit B11E). At the hearing, the claimant testified that he could not work due to pain in his low back, sharp pains his legs, and swelling in his feet that causes him to pass out and fall to the ground. He stated that his legs and feet just go cold and numb. He reported that he underwent pain injections that did not help; was going to physical therapy but has no money to go for treatment; and takes gabapentin, which does not relieve his symptoms. He reported that he has issues with breathing for which his primary care provider prescribes him medication, and cannot be in the heat, which exacerbates his symptoms. He testified that he could lift and carry no more than 30 pounds; could walk no further than 50 feet before having to stop and rest; could stand no more than 30 minutes; could sit no more than 45 minutes before changing positions; bending causes him pain; and he must elevate his legs when he watches television due to swelling. He reported that uses a cane around the house that was not prescribed

> and has brought it with him to medical appointments, but his doctor has not commented on it. He stated that he stood 6'1" tall and weighed 260 pounds but his weight fluctuates. He stated that he was a slow learner, had special education in school and difficulty in school with math and reading, but graduated high school. He testified that when he was working, other than taking some extra time to learn the jobs, he did not require any assistance to perform his work. He reported that he gets mean and nasty possibly from his pain and his doctor was looking into ways to help him; otherwise, he has had no formal mental health treatment or history of inpatient psychiatric hospitalization. He stated that his primary care provider prescribes him medication for his mood (Hearing Testimony).

(Tr. 18-19).

The ALJ concluded that the previously summarized longitudinal medical evidence of record did not fully support his allegations concerning the intensity, persistence, and limiting effects of his symptoms, stating:

> All told, the undersigned has considered the effects of the claimant's lumbar impairment combined with some degree of limitation with the bilateral lower extremities, his obesity, and his breathing issues in lowering the claimant to the light exertional level and providing postural limitations. The undersigned gave further consideration to the claimant's lumbar radiculopathy by providing specific limitations to restrict the use of both lower extremities with the operation of pedals and foot controls. The undersigned provided environmental limitations to limit aggravation of symptoms and to prevent injury in the workplace. However, the degree of abnormality on diagnostic testing, the many clinical findings within normal limits and the conservative level of treatment would not support greater limitations. In terms of the mental limitations, the undersigned considered the combined effects of moderate limitation to concentration, persist and maintaining pace and moderate limitation to understanding, remembering and applying information by reducing the claimant to unskilled work and occasional

16

decision-making. The undersigned also considered the claimant's problems with adaption in placing limitations to low stress and occasional changes in the work setting. However, the conservative, albeit limited, level of treatment, the claimant's clinical findings, and level of activity would not support even greater mental limitations.

(Tr. 22-23).

Finally, the ALJ considered the medical opinion evidence. With regard to his physical impairments, the ALJ found the State agency medical consultant opinions that Good was capable of performing light work with certain restrictions persuasive, stating they were consistent with and supported by the evidence, which demonstrated no more than conservative treatment for his physical complaints, generally normal clinical findings, aside from tenderness and decreased range of motion in the lumbar spine, and the degree of abnormality noted on diagnostic imaging. (Tr. 23-24). The ALJ found the more restrictive opinion of CRNP Schultz only partially persuasive, noting that the lifting and carrying limitations were not consistent with or supported by the objective examination findings and the standing, walking, and sitting limitations were not consistent with or supported by her findings of normal gait, no assistance needed when transferring, and no difficulty walking on heels and toes. (Tr. 23)

As to the opinions of Good's mental RFC, the ALJ found the opinion of consultative mental examiner Dr. Cole persuasive, as it was consistent with and

supported by the mental status examination findings and the nature and scope of his treatment history, which reflected very little mental health treatment. (Tr. 24). The ALJ also found the opinions of Drs. Rattan and Long persuasive and consistent with the medical evidence of record, lack of mental health treatment and psychiatric complaints, and his employment history as well as supported by the consultative mental status examination findings. (Tr. 24-25). However, the ALJ stated:

> In consideration of all the evidence of record, including the observations from the consultative evaluation, the undersigned finds the claimant would be limited to performing unskilled work within the above parameters, but notes that the record does not support finding that the claimant would require any greater limitations than included above, or support finding that she would have any more than mild to moderate limitations under the paragraph B criteria.

(Tr. 25). The ALJ found the less restrictive opinion of Dr. Mendoza not persuasive, finding it was not consistent with the overall medical evidence of record supporting more moderate limitations. (Tr. 25).

Having made these findings, the ALJ concluded that Good could not perform any past relevant work, but that considering his age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Good could perform. (Tr. 27-28). Accordingly, the ALJ concluded Good had not been met the exacting standard of disability set by law from the amended onset date through the date of his decision. (Id.)

18

This appeal followed. (Doc. 1). On appeal, Good argues that the ALJ failed to conduct a function-by-function assessment of his physical abilities with regard to his ability to sit, stand, and walk, and omitted relevant limitations assessed by the opinions of the mental consultants which he found persuasive. However, finding that substantial evidence supported the ALJ's decision in this case, for the reasons set forth below, we will affirm the decision of the Commissioner.

## III.  Discussion

### A.  Substantial Evidence Review – the Role of this Court

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a

conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. <u>T-Mobile South, LLC v. Roswell</u>, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." <u>Ibid.</u>; <u>see, e.g.</u>, <u>Perales</u>, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Consolidated Edison</u>, 305 U.S. at 229, 59 S.Ct. 206. See <u>Dickinson v. Zurko</u>, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)

(comparing the substantial-evidence standard to the deferential clearly-
erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that she is not disabled is

supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence.") (alterations omitted); Burton v. Schweiker, 512 F.

Supp. 913, 914 (W.D.Pa. 1981) ("The Secretary's determination as to the status of a

claim requires the correct application of the law to the facts."); see also Wright v.

Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal

matters is plenary); Ficca, 901 F. Supp. 2d at 536 ("[T]he court has plenary review

of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of

review. First, when conducting this review, "we are mindful that we must not

substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d

607, 611 (3d Cir. 2014) (citing Rutherford, 399 F.3d at 552). Thus, we are enjoined

to refrain from trying to re-weigh the evidence. Rather, our task is to simply

determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir. 2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice, ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

This principle applies with particular force to legal challenges, like the claim made here, based upon alleged inadequacies in the articulation of a claimant's mental RFC. In Hess v. Comm'r Soc. Sec., 931 F.3d 198, 212 (3d Cir. 2019), the

United States Court of Appeals recently addressed the standards of articulation that apply in this setting. In <u>Hess</u> the court of appeals considered the question of whether an RFC which limited a claimant to simple tasks adequately addressed moderate limitations on concentration, persistence, and pace. In addressing the plaintiff's argument that the language used by the ALJ to describe the claimant's mental limitations was legally insufficient, the court of appeals rejected a *per se* rule which would require the ALJ to adhere to a particular format in conducting this analysis. Instead, framing this issue as a question of adequate articulation of the ALJ's rationale, the court held that: "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.' " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 211 (3d Cir. 2019). On this score, the appellate court indicated that an ALJ offers a valid explanation a mental RFC when the ALJ highlights factors such as "mental status examinations and reports that revealed that [the claimant] could function effectively; opinion evidence showing that [the claimant] could do simple work; and [the claimant]'s activities of daily living, . . . . " <u>Hess v. Comm'r Soc. Sec.</u>, 931 F.3d 198, 214 (3d Cir. 2019).

In our view, the teachings of the <u>Hess</u> decision are straightforward. In formulating a mental RFC the ALJ does not need to rely upon any particular form

23

of words. Further, the adequacy of the mental RFC is not gauged in the abstract. Instead, the evaluation of a claimant's ability to undertake the mental demands of the workplace will be viewed in the factual context of the case, and a mental RFC is sufficient if it is supported by a valid explanation grounded in the evidence.

### B.     Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy.  42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process,

the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical

25

opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other

evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

## C. **Legal Benchmarks for the ALJ's Assessment of Medical Opinions**

The plaintiff filed this disability application following a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." Revisions to Rules Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at
*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions.
Judicial review of this aspect of ALJ decision-making is still guided by several
settled legal tenets. First, when presented with a disputed factual record, it is well-
established that "[t]he ALJ – not treating or examining physicians or State agency
consultants – must make the ultimate disability and RFC determinations." Chandler
v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating
medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence
for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d
Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision
is accompanied by an adequate, articulated rationale, it is the province and the duty
of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without
> crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015);
> Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that
> "SSR 96–2p does not prohibit the ALJ from crediting some parts of a
> treating source's opinion and rejecting other portions"); Connors v.
> Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June
> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the

31

different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D. **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Judged against these deferential standards of review, we find that substantial evidence supported the decision by the ALJ that Good retained the residual functional capacity to perform a range of light work in "low stress" jobs requiring only simple, routine, and repetitive tasks with additional postural and emotional limitations. Therefore, we will affirm this decision.

32

### 1. *The ALJ's RFC limiting him to light work accounted for the standing, walking, and sitting limitations the ALJ found persuasive.*

The plaintiff first argues that the ALJ erred in limiting him to just light work without including any specific standing or walking limitations despite finding the stand/walk limitations to six hours per day persuasive. He argues that, in failing to include any standing or walking limitations within the RFC assessment, the ALJ failed to conduct the requisite function-by-function assessment required by SSR 96-8p. We disagree.

In fact, the Third Circuit has rejected the argument that simply limiting a claimant to light work amounts to a failure to define sitting, standing, and walking limitations in terms of the RFC, but rather found that such a limitation implicitly addresses these functions. Navas v. Comm'r of Soc. Sec., 289 F. App'x 555, 558 (3d Cir. 2008) (rejecting a claimant's argument that the ALJ failed to define her sitting, standing, and walking limitations, stating "by finding that Navas could perform light work, the ALJ implicitly found that she could work at a job that involves 'a good deal of walking or standing,' or a job that 'involves sitting most of the time with some pushing and pulling of arm or leg controls."). Indeed, this Court has affirmed decisions even where the ALJ did not discuss a claimant's ability to sit, stand, or walk individually. In a similar case, Magistrate Judge Arbuckle explained:

Plaintiff argues that the ALJ's RFC assessment is deficient as a matter of law because it does not include a function-by-function assessment of Plaintiff's limitations. In particular she argues that, instead of separately setting out the individual limitations to Plaintiff's ability to sit, stand, and walk, the ALJ simply cites to the definition of "light" work. (Doc. 13, pp. 5-6). Plaintiff is correct that neither the RFC assessment itself nor the narrative discussion that follows discusses Plaintiff's ability to sit, stand, or walk individually. We are not, however, persuaded that this issue requires remand.

It is well-established that although an ALJ's RFC assessment "must first identify an individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," an ALJ is not required to use particular language or adhere to a particular format in conducting that analysis. Instead, an ALJ is only required to provide "sufficient development of the record and explanation of [his or her] findings to permit meaningful review." This principle has been extended to issues like this one, where an ALJ articulated an RFC assessment in terms of an exertional category without discussing sitting, standing, or walking separately.

Danielle R. v. Kijakazi, No. 1:22-CV-1446, 2023 WL 6130588, at *8 (M.D. Pa. July 28, 2023), report and recommendation adopted sub nom. Riebling v. Kijakazi, No. 1:22-CV-01446, 2023 WL 6129498 (M.D. Pa. Sept. 19, 2023) (citing Navas, 289 F. at 558; Johnny R. v. Kijakazi, No. 2:20-CV-12818, 2023 WL 4073960, at *6 (D.N.J. June 20, 2023) (finding that an ALJ's RFC assessment limiting a claimant to sedentary work was effectively an assessment that the claimant could sit for up to six hours in an eight-hour workday, stand/walk for up to two hours in and eight-hour workday, and lift/carry up to ten pounds)).

34

Here, the ALJ found the medical consensus of opinion that Good could stand and/or walk for a total of six hours in an eight-hour workday, persuasive. (Tr. 24). He then concluded that Good could perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), but with some additional postural and environmental limitations. SSR 83-10 explains, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Titles II & Xvi: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983). Thus, since the opinion evidence which the ALJ found persuasive did not include any more extreme or specific sitting, standing, or walking limitations than what is already included in the light work limitation, no more was needed here.

Nonetheless, as the defendant points out, the ALJ did discuss the plaintiff's ability to sit, stand, and walk throughout the RFC analysis, noting: "All told, the undersigned has considered the effects of the claimant's lumbar impairment combined with some degree of limitation with the bilateral lower extremities, his obesity, and his breathing issues in lowering the claimant to the light exertional level and providing postural limitations." (Tr. 22). Moreover, in discussing the medical opinion evidence, the ALJ specifically addressed why CRNP Shultz's more restrictive sit, stand, and walk limitations were not persuasive, noting: "The

undersigned is not persuaded by the standing, walking, and sitting limitations, which are not consistent with or supported by the objective findings on exam that showed normal gait, no assistance needed when transferring, no difficulty walking on heels and toes." (Tr. 23). More importantly, the opinions which the ALJ did find persuasive, those of Drs. Kim, Brislow, and Gandhi, all found the plaintiff was capable of standing and/or walking for a total of six hours in an eight-hour workday, (Tr. 99, 117, 705) – limitations which are fully compatible and "implicitly addressed" in a light work RFC.  There was no error here.

### 2. *The ALJ's Assessment of Good's Mental Impairment Complied with Hess.*

The plaintiff also argues that the ALJ erred in evaluating his mental impairment. Specifically, the plaintiff avers that the ALJ's limitation to simple, routine, and repetitive tasks and unskilled work with SVP 2 did not encompass the one-to-two step limitation or "very short simple instructions" limitations opined by Dr. Rattan or the moderate limitation in ability to carry out detailed instructions opined by Dr. Long.

As explained above, "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).

Moreover, [a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." <u>Durden</u>, 191 F. Supp. 3d at 455. Thus, at the outset, while the ALJ found the opinions of Drs. Rattan and Long persuasive, he was entitled to incorporate parts of their opinions in the RFC without adopting each and every limitation.

Furthermore, Good's challenge to this decision based upon alleged inconsistencies between the opinions of Dr. Rattan and Dr. Long fails when it is viewed through the pragmatic analytical lens prescribed by the Court of Appeals in <u>Hess</u>. The plaintiff focuses on Dr. Rattan's narrative notes accompanying the mental RFC assessment which state that Good is able to meet the basic mental demands to complete 1-2 step tasks on a sustained basis and that he is able to carry out very short and simple instructions. The plaintiff argues first that, despite finding the opinion of Dr. Rattan persuasive, the RFC adopted by the ALJ is inconsistent with this narrative assessment because a limitation to simple, routine, and repetitive tasks is not the same as "short instructions" are not the same as "simple instructions." Nonetheless, viewed as a whole, Dr. Rattan's RFC assessment is generally consistent with the RFC assessment. For example, Dr. Rattan found Good was moderately limited in his ability to understand and remember detailed instructions, but explained that "the claimant can understand, retain, and follow simple instructions and perform simple,

37

routine, repetitive tasks in a stable environment." (Tr. 101). Moreover, despite the narrative explanation stating "the claimant is able to carry out very short and simple instructions," Dr. Rattan also opined that Good was not significantly limited in carrying out even detailed instructions, and was only moderately limited in any area of sustained concentration and persistence.

Dr. Long opined that Good was moderately limited in his ability to carry out detailed instructions but confirmed that Good retained the ability to "understand, retain, and follow simple instructions" and to "perform simple, routine, repetitive tasks in a stable environment," restrictions which are largely congruent with the RFC. Therefore, given this opinion evidence a simple tasks RFC is entirely consistent with the teaching of  Hess, that "as long as the ALJ offers a 'valid explanation,' a 'simple tasks' limitation is permitted after a finding that a claimant has 'moderate' difficulties in 'concentration, persistence, or pace.'" Hess v. Comm'r Soc. Sec., 931 F.3d 198, 211 (3d Cir. 2019).

Here, the ALJ provided a valid explanation for this RFC, which limited Good to work which would take no more than 30 days of training to learn with a specific vocational preparation level of two (SVP2), which are generally classified as unskilled; require him only to understand, remember and carry out simple instructions; perform simple, routine and repetitive tasks; and which are "low stress"

in that they would involve only occasional, simple decision making and only occasional, gradual changes in the work duties and work setting. These detailed restrictions incorporated the opinions which the ALJ found to be most persuasive, when viewed in a pragmatic lens considering Good's treatment history and reported activities of daily living. As the ALJ explained:

> The undersigned finds these opinions persuasive, as they are consistent with the overall medical evidence of record, including the reported history of special education, the essential lack of mental health treatment and psychiatric complaints, and his employment history indicating that when he was working, other than taking some extra time to learn the jobs, he did not require any assistance to perform his work, which ranged largely from semi-skilled to skilled work, as discussed. The undersigned finds these opinions are supported by the consultative mental status exam findings showing difficulty with focus, a mild impairment with memory, and the reported learning delays, as well as his symptoms of irritability and frustration due to his back pain preventing him from working. However, the claimant was noted to be cooperative, related fairly, was well groomed, with normal behaviors and fair insight and judgement, as discussed. In consideration of all the evidence of record, including the observations from the consultative evaluation, the undersigned finds the claimant would be limited to performing unskilled work within the above parameters, but notes that the record does not support finding that the claimant would require any greater limitations than included above, or support finding that she would have any more than mild to moderate limitations under the paragraph B criteria.

(Tr. 25).

Thus, to the extent the plaintiff argues the ALJ was required to more specifically discuss Dr. Rattan's mention of one-to-two step tasks, the ALJ explained

that "the record does not support finding that the claimant would require any greater limitations than included above, or support finding that she would have any more than mild to moderate limitations under the paragraph B criteria." (<u>Id.</u>) Under the pragmatic standard of <u>Hess</u>, the ALJ adequately explained how the RFC adequately accounted for any moderate limitations opined by these experts. Furthermore, when read in a commonsense fashion, the RFC is fully supported by the evidence relating to Good's treatment history and reported activities of daily living. Moreover, the RFC is largely congruent with the expert opinions that the ALJ found to be persuasive, as he adopted the "paragraph B" limitations on which these experts all concurred. Therefore, when viewed through the pragmatic and holistic lens mandated by the court of appeals in <u>Hess</u> this argument fails.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.'" <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas,</u>

<u>Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and affirm the decision of the Commissioner.

**IV.    <u>Conclusion</u>**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: August 28, 2025